[No. C018783. Third Dist. May 23, 1995.]

COUNTY OF SAN JOAQUIN, Plaintiff and Respondent, v.
S. KIMBERLY BELSHÉ, as Director, etc., Defendant and Appellant.

**8**

COUNSEL

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland III, Assistant Attorney General, Dennis Eckhart and Andrea Lynn Hoch, Deputy Attorneys General, for Defendant and Appellant.

Hooper, Lundy & Bookman and Douglas S. Cumming for Plaintiff and Respondent.

OPINION

**BROWN, J.**—In this appeal from a judgment granting a petition for writ of mandate, we consider the application of Welfare and Institutions Code section 14171 (further undesignated statutory references are to this code), a statute designed to expedite appeals from audits by the Department of Health Services (Department) of claims submitted by institutional Medi-Cal providers. The statute imposes a penalty against the Department for delay in conducting the appeal hearing or in adopting the final decision of the administrative law judge (ALJ). In this case, the trial court found the penalty did apply to the final decisions on two administrative appeals by the institutional provider, San Joaquin General Hospital (Hospital).

The Department appeals, contending the trial court erred because the penalty only applies where the institutional provider has been overpaid, and there was never a determination that the Hospital had been overpaid for the fiscal years in question. We shall affirm in part and reverse in part.

FACTS

An overview of the Medi-Cal reimbursement system is necessary to understand and resolve the issues presented in this appeal.

The federal government has instituted a system for providing health care to low-income persons by enacting the Medicaid Act as a part of the Social Security system. (42 U.S.C. § 1396 et seq.) The federal act authorizes grants to the states which, in accordance with federal law, administer the aid program. (*Ibid.*)

California enacted the Medi-Cal Act to implement the federal program. (§ 14000 et seq.) In addition to the statutory constraints, the Medi-Cal program is subject to extensive regulation. (§ 14105; Cal. Code Regs., tit.

22, §§ 50000-59999.) The regulations and statutes create an administrative framework, determine eligibility of beneficiaries, set qualifications for providers, describe benefits, set reimbursement payments, and provide for dispute resolution. (*Ibid.*) The Department is the state agency which administers the Medi-Cal program. (§ 10721; Cal. Code Regs., tit. 22, § 50004.)

Under the Medi-Cal program, health care providers render goods and services to eligible beneficiaries, submit bills to the Department or a designated financial intermediary, and receive reimbursements. (§§ 14000.3, 14104.3, 14104.6-14104.8, 14115; Cal. Code Regs., tit. 22, § 50007.) However, because institutional providers, like the Hospital, provide services for multiple beneficiaries over extended periods, the procedure for payment differs somewhat from that employed by noninstitutional providers who generally service fewer beneficiaries on an intermittent basis.

In order to facilitate the ongoing provision of services, the Department makes interim payments to the institutional providers throughout the fiscal year. (Cal. Code Regs., tit. 22, §§ 51536, subd. (c), 51547, subd. (a)(2).) The interim payments are based on the customary charges for the type of services rendered and are a percentage of the costs incurred in prior years. (Cal. Code Regs., tit. 22, §§ 51536, subd. (c), 51545, subd. (a)(45).) Institutional providers submit a cost report at the end of each fiscal year which details the cost of services provided and the number of beneficiaries who received them. (Cal. Code Regs., tit. 22, §§ 51016, subd. (a)(13)(B), 51545, subd. (a)(19).)

When the institutional provider submits the cost report, the Department assumes the data in the cost report is accurate and applies various assessment protocols to the cost report in order to determine the institutional provider's unaudited allowable costs for the fiscal year. (§ 14170; Cal. Code Regs., tit. 22, §§ 51536, subd. (a)(9), 51539.) The amount determined may be, but probably is not, the same as the amount the institutional provider claimed in the cost report. The Department then compares the allowable costs derived from the unaudited cost report to the amount of interim payments and determines whether the interim payments have been sufficient to compensate the institutional provider for the fiscal year. (Cal. Code Regs., tit. 22, § 51536.) If not, the Department calculates the amount owing to the institutional provider and pays this amount, called a tentative settlement. (Cal. Code Regs., tit. 22, §§ 51536, subd. (b)(9), 51545, subd. (a)(96).)

As a practical matter, the interim payments are always less than the amount claimed in the cost report, and are generally less than the total amount due the provider after the initial adjustments to the cost report, if

any, are made. Thus, the institutional provider can expect a tentative settlement payment after the cost report is submitted for each fiscal year.

As noted, the tentative settlement is based on the unaudited figures in the cost report. However, the Department may choose to audit the institutional provider's cost report at any time during the three years following the close of the fiscal year or the date of submission of the report. (§ 14170.) In the audit, the Department no longer assumes the accuracy of the figures in the cost report, but instead investigates the institutional provider's records and, applying appropriate state and federal guidelines for allowable and reimbursable costs, *redetermines* the amount, if any, which was previously found to be due the institutional provider at the time of the tentative settlement. (Cal. Code Regs., tit. 22, § 51536, subd. (b)(10).)

Of necessity, the audit takes into account only the costs claimed by the institutional provider in its cost report and the interim payments made during the fiscal period being audited, and *does not* take into account the tentative settlement payment itself, as that payment occurred after the close of the fiscal period and is the amount which is being verified by the audit. The amount due to the provider, as recalculated by the audit, is the final settlement. (Cal. Code Regs., tit. 22, § 51536, subd. (b)(10).) If the final settlement is less than the tentative settlement paid to the institutional provider, the institutional provider has been overpaid and the Department makes a demand for repayment of the difference. (Cal. Code Regs., tit. 22, §§ 51016, subd. (a)(4), 51047.)

The institutional provider has the right to appeal both the tentative settlement and the final settlement resulting from the audit. (§§ 14104.5, 14171; Cal. Code Regs., tit. 22, § 51016.) The appeal must specify the disputed issues in writing. (Cal. Code Regs., tit. 22, §§ 51017, 51022, subd. (d), 51024, subd. (a).) Only these issues will be reviewed. (*Ibid.*) The institutional provider may participate in both an informal and a formal review. (§ 14171; Cal. Code Regs., tit. 22, §§ 51023, 51024.) Adjustments to the final settlement may be made at any stage of the review as issues are resolved by ruling or agreement. (Cal. Code Regs., tit. 22, §§ 51021-51024.)

After a formal hearing, if one is requested, the ALJ submits a proposed decision to the Department. (Cal. Code Regs., tit. 22, § 51044.) The Department may adopt or modify the decision (§ 14171; Cal. Code Regs., tit. 22, § 51044), thereby determining the correct amount of the final settlement, that is, the amount *which should have been paid* to the institutional provider at the close of the fiscal year to balance its account. However, depending on the results of the various levels of review, this revised amount may be either

more or less than the tentative settlement previously paid to the institutional provider. Thus, the review process ultimately may result in a determination that the institutional provider was either overpaid *or* underpaid. The Legislature has provided an incentive for prompt review in cases of overpayment by reducing the amount of any overpayment due the Department if the proposed decision is not adopted in a timely fashion. (§ 14171, subd. (e).)

We turn now to the facts of this case.

The Hospital submitted cost reports to the Department for the fiscal years ending June 30, 1982 (FY-82) and June 30, 1983 (FY-83). The Department processed these cost reports and calculated a tentative settlement due the Hospital of $754,624 for FY-82 and $1,884,194 for FY-83. The Hospital did not seek review of the tentative settlement and both amounts were paid to it.

Within three years, the Department elected to audit the Hospital's cost reports for FY-82 and FY-83, calculated a final settlement and determined the Hospital in fact was due only $412,658 for FY-82 and only $486,625 for FY-83. The Department demanded repayment of the difference.

The Hospital appealed the results of the audit, contesting various disallowed costs and adverse findings. Through both informal and formal review, the majority of disputed issues were resolved, adjusted, or abandoned and a revised calculation of the final settlement amount at each stage resulted in differing "amounts due provider." Ultimately, on March 23, 1989, the ALJ rendered a decision, finding the revised final settlements due the Hospital were $829,081 for FY-82 and $890,782 for FY-83. The Department adopted the report internally on September 12, 1989, but did not notify the Hospital of this action until February 14, 1990.

As the ALJ ruled adversely to the Hospital on some of the disputed issues, the Hospital filed a petition for writ of mandate in the superior court to review the decision and requested the court to impose a penalty on the Department for delay in adopting the report. After a hearing, the trial court ruled on the merits, but denied sanctions, stating it found "no determination by the department or director that [the Hospital] improperly received or was overpa[i]d Medi-Cal reimbursement for FPE 6-30-82 or FPE 6-30-83. [The Hospital's] cost reports, the department's audit reports, the department's reports of findings in the informal audit appeal hearings, and the director's hearing decision uniformly determined that petitioner had been underpaid for the services provided to Medi-Cal beneficiaries during FPE 6/30/82 or FPE 6/30/83. . . . . Absent an overpayment which was 'ultimately determined by the department to be due' from petitioner, the reduction provision

of Welfare and Institutions Code section 14171, subdivision (e), cannot be applied."

The Hospital moved for reconsideration, providing clarifying facts and arguing section 14171, subdivision (e) should apply to the portion of the overpayment represented by the disputed items on which its appeals were fruitless. The trial court granted the motion. On reconsideration, the trial court concluded the penalty provision did apply and ordered the overpayment due the Department reduced as to the disputed costs claimed in the Hospital's cost reports "which were the subject of the administrative appeal decision at issue."

## DISCUSSION

The Department contends the trial court erred in ruling that the overpayment for specific challenged items was subject to the penalty clause of section 14171, subdivision (e). The Department asserts that, overall, the Hospital was underpaid, since the interim payments were less than the total amount owed to the Hospital. Moreover, the Department argues, no overpayment was "ultimately determined [by it] to be due" from the Hospital as required by section 14171; instead, the appeal process consistently found "amounts due provider."

The Department's argument ignores that the Hospital actually was paid the tentative settlement and that the appeals process simply redetermines the amount which initially should have been paid the Hospital at the time of the tentative settlement without considering the tentative settlement payment.

Section 14171 generally establishes an appeal process of formal and informal appeals, setting time limits for completion of various stages. Prior to 1988, the statute set time limits and penalized the Department for delay only in appeals by noninstitutional providers. (Stats. 1987, ch. 56, § 188, pp. 239-240.) In 1988, the Legislature amended the statute to set forth "particular time frames within which cases must be adjudicated and written" and to delete the word "noninstitutional" from the penalty provision so that "all health care providers [would be] subject to and possible beneficiaries of the time limits." (Sen. Bill No. 2424, Enrolled Bill Rep. (Sept. 1988) p. 1.)

Presently, the statute provides time limitations for institutional provider appeals (§ 14171, subds. (f)(3), (g)) and states: "The time limitations in subdivisions (f) and (g) for the impartial hearing and the final decisions are mandatory. If the department fails to conduct the hearing or to adopt a final decision thereon within the time limitations provided in subdivisions (f) and

(g), the amount of any overpayment which is ultimately determined by the department to be due shall be reduced by 10 percent for each 30-day period, or portion thereof, that the hearing or the decision, or both, are delayed beyond the time limitations provided in subdivisions (f) and (g). . . ." (§ 14171, subd. (e).) Thus, the penalty can *only* apply if there is an "overpayment which is ultimately determined by the department to be due."

Clearly, if the final settlement resulting from the audit was the same or greater than the tentative settlement, there would be no overpayment *initially* determined to be due and no letter demanding repayment would be sent. It is only when the audit disallows items which were previously assumed correct and the resulting final settlement is less than the tentative settlement *which has already been paid* to the institutional provider, that there will be any overpayment at all or any demand for repayment. Obviously, it is in the latter situation that the institutional provider is likely to appeal in order to convince the Department or the impartial hearing officer that a revised final settlement with appropriate adjustments, should be at least equal to, if not greater, than the tentative settlement so that no repayment is required. To the extent that the institutional provider is unsuccessful in this endeavor, and the revised final settlement after all adjustments is less than the tentative settlement, there will remain an overpayment to the institutional provider which must be repaid to the Department.[1]

As we have seen, the audit and appeals processes do not *directly* calculate the amount of an overpayment, as the function of these procedures is to redetermine, presumably with greater accuracy, the amount of the final settlement, i.e., the amount which should have been due from the Department to the Hospital at the time the tentative settlement was calculated and

[1]The actual status of the ongoing account between the Department and the Hospital does not make this clear since, unlike noninstitutional providers who are not required to repay any overpayment until the appeal process is complete, institutional providers must settle their accounts in spite of the ongoing dispute. (§ 14172.5; Cal. Code Regs., tit. 22, § 51047, subd. (a).) The Hospital may elect to permit the Department to recover the overpayment by offsets or withholds against current payments rather than remit a single payment in response to the demand letter. (Cal. Code Regs., tit. 22, § 51047.) Thus, the balance sheet of the account of a fiscal year which is being audited will reflect ongoing adjustments including the tentative settlement payment, a final settlement, offsets if necessary, further final settlement adjustments as the appeal process proceeds, repayment to the Hospital if too much has been offset and any other credits or debits which occur. This accounting process does not occur for the noninstitutional provider who may have no more than a single bill and whose overpayment is not subject to liquidation until the appeal process is final. The above discussion therefore focuses on the *process*, which is parallel for institutional and noninstitutional providers, rather than the actual accounting, which is not. This effectuates the intent of the Legislature, i.e., to extend the benefits and protection of section 14171 to both types of providers, since the language of the penalty provision does not distinguish between the two types of payments and appeals.

paid. As it is a simple matter to compare the amount of the final settlement as adjusted by the appeals process with the tentative settlement which was paid to the Hospital, once the Department has adopted a final decision, the final decision, in effect, also determines the amount of overpayment. The calculating function itself necessarily takes place after the ALJ's decision is adopted.

The time limits of section 14171 apply to adoption of the report, but the penalty refers to the subsequent calculation based on the decision of the ALJ; thus, it is not enough, as the Department argues, to refer only to the results of the audit, the informal hearing decision or the final decision adopted by the director to determine whether the institutional provider has been overpaid or underpaid. It is necessary to take the next step and compare the final settlement amount, as adjusted after the hearing process, with the tentative settlement amount previously paid to the provider in order to determine whether an overpayment exists.

Although the final accounting calculations are not a part of the record, we can determine from the record before us whether the Hospital in fact was overpaid for FY-82 or FY-83 by comparing the tentative settlement amounts for each year with the adjusted final settlement amount which appears in the decision adopted by the Department. For FY-82, the Hospital received a tentative settlement payment of $754,624. Following the appeals process, the ALJ determined the Hospital should have received $829,081. Thus for FY-82, the Hospital was *underpaid* and the penalty provisions of section 14171, subdivision (e) cannot apply. However, for FY-83, the Hospital received $1,884,194 as a tentative settlement payment. Following the appeals process, the ALJ determined the Hospital should have been paid only $890,782. Thus, for FY-83, the Hospital was overpaid $993,412, and the penalty provision does apply.

The Hospital argues that overpayment must be determined by comparing the interim payments with the amount claimed in its cost reports. This argument assumes the institutional providers are paid the amounts claimed in the cost report. As we have seen, such is not the case. The cost report provides data from which the tentative settlement payment is calculated. It is only this amount which is actually paid. Because the Legislature intended only to extend the benefits then available to noninstitutional providers to the institutional providers, the statute contemplates no more than applying the penalty provision to amounts actually overpaid and for which repayment demand was made as it previously did for noninstitutional providers.

However, the Hospital asserts, and we agree, that the penalty clause may apply only to those items challenged by the institutional provider in the

appeals process. The purpose of the statute is to reduce delays in the appeal process. This purpose is not served by reducing overpayments which are not challenged.

## DISPOSITION

The judgment is reversed only insofar as it applies the penalty provisions of section 14171, subdivision (e) to the appeal of the FY-82 audit and revised final settlement. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

Sims, Acting P. J., and Scotland, J., concurred.